HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMERICAN FREEDOM DEFENSE INITIATIVE, et al.,

Plaintiffs,

v.

KING COUNTY,

Defendant.

CASE NO. C13-1804RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on a motion for preliminary injunction by plaintiffs American Freedom Defense Initiative ("AFDI"), Pamela Geller, and Robert Spencer. Dkt. # 7. Defendant King County opposes (Dkt. # 12), and also moves the court for a stay after the court rules on the preliminary injunction motion (Dkt. # 10). Having considered the memoranda, exhibits, oral argument, and the record herein, the court DENIES plaintiffs' motion for preliminary injunction and DENIES defendant's motion for a stay in the proceedings.

## II. BACKGROUND

Defendant King County's Department of Transportation operates a public transportation system of buses ("Metro"), consisting of more than 235 routes and serving approximately 400,000 passengers daily. Dkt. # 13 (Desmond Decl.) ¶ 6. Metro runs a

ORDER - 1

revenue-based advertising program to generate supplemental financial support, and as a part of that program, Metro sells advertising space on the exterior of its buses. *Id.* ¶¶ 7-8, 11; Dkt. # 14 (Shinbo Decl.) ¶ 3. Prior to 2010, advertising restrictions were accomplished through restrictive clauses in Metro's advertising contract with Titan Outdoor LLC ("Titan"). Dkt. # 13 (Desmond Decl.) ¶ 14; Dkt. # 14 (Shinbo Decl.) ¶¶ 4-5. However, beginning in 2010, Metro adopted an Interim Metro Advertising Policy, which was replaced by the Transit Advertising Policy. Dkt. # 13 (Desmond Decl.) ¶¶ 15-16; Dkt. # 14 (Shinbo Decl.) ¶¶ 5-6. The Transit Advertising Policy (the "Policy") was adopted in January 2012, and is incorporated into general department policies and procedures. Dkt. # 13 (Desmond Decl.) ¶ 17; Dkt. # 14 (Shinbo Decl.) ¶ 6. All potential ads are screened by Titan, and, if there is a question about compliance with the Policy, the ads are passed to Sharron Shinbo, the Advertising Program Manager, for further evaluation. Dkt. # 13 (Desmond Decl.) ¶ 19; Dkt. # 14 (Shinbo Decl.) ¶ 8. Ms. Shinbo has discretion to submit the ad to Kevin Desmond, the General Manager at Metro, who makes the final determination of whether an ad is consistent with the Policy. Dkt. # 13 (Desmond Decl.) ¶ 19; Dkt. # 14 (Shinbo Decl.) ¶ 8.

On May 17, 2013, defendant accepted a "Faces of Global Terrorism" advertisement submitted by the United States Department of State. Dkt. # 14 (Shinbo Decl.) ¶ 13. After receiving numerous complaints that the advertisement was demeaning and disparaging to Muslims and people of color, the State Department withdrew the ad on its own and submitted a replacement advertisement, which defendant accepted. *Id.* ¶¶ 14-18, Exs. E-H. On August 1, 2013, AFDI submitted its own version of the "Faces of Global Terrorism" advertisement. *Id.* ¶ 20, Ex. J. On August 14, 2013, defendant rejected AFDI's ad because it violated three provisions of the Policy: 6.2.4, 6.2.8, and 6.2.9. *Id.* ¶ 23, Ex. K.

Section 6.2.4 of the Policy provides: "<u>False or Misleading</u>. Any material that is or that the sponsor reasonably should have known is false, fraudulent, misleading, deceptive

or would constitute a tort of defamation or invasion of privacy." Dkt. # 7-6 at 6 (Ex. E to Geller Decl.); # 13 at 31 (Ex. C to Desmond Decl.). Section 6.2.8 of the Policy provides:

> <u>Demeaning or Disparaging</u>. Advertising that contains material that demeans or disparages an individual, group of individuals or entity. For purposes of determining whether an advertisement contains such material, the County will determine whether a reasonably prudent person, knowledgeable of the County's ridership and using prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of any individual, group of individuals or entity.

*Id.* at 7; Dkt. # 13 at 32. Section 6.2.9 provides:

> <u>Harmful or Disruptive Transit System</u>. Advertising that contains material that is so objectionable as to be reasonably foreseeable that it will result in harm to, disruption of or interference with the transportation system. For purposes of determining whether an advertisement contains such material, the County will determine whether a reasonably prudent person, knowledgeable of the County's ridership and using prevailing community standards, would believe that the material is so objectionable that it is reasonably foreseeable that it will result in harm to, disruption of or interference with the transportation system.

*Id.*

## III. ANALYSIS

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008). An injunction will not issue if the moving party merely shows a possibility of some remote

future injury or a conjectural or hypothetical injury. *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011).

Under the "serious questions" variation of the test, a preliminary injunction is proper if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff, the balance of hardships tips sharply in favor of the moving party, and the injunction is in the public interest. *Lopez*, 680 F.3d at 1072. The elements must be balanced, so that a stronger showing of one element may offset a weaker showing of another. *Id.*

Additionally, mandatory injunctions are particularly disfavored, and are not granted unless extreme or very serious damage will result, and are not issued in doubtful cases. *Id.*

**A. Likelihood of Success on the Merits**

When considering a First Amendment claim regarding free speech on government-owned property, the court must first "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). If the forum is public, then a speech exclusion must be "necessary to serve a compelling state interest and the exclusion [must be] narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800. If the forum is non-public, then the government may restrict speech "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius*, 473 U.S. at 800 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). "When the government intentionally opens a nontraditional forum for public discourse it creates a designated public forum." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir. 1999).

"Restrictions on expressive activity in designated public fora are subject to the same limitations that govern a traditional public forum." *Id.* at 964-65.

The Ninth Circuit has also recognized an additional type of forum that shares features of both public and non-public spaces: the limited public forum. The limited public forum is "a subcategory of a designated public forum that 'refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics.'" *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (quoting *DiLoreto*, 196 F.3d at 965). Speech restrictions in a limited public forum must be "viewpoint neutral and reasonable in light of the purpose served by the forum[.]" *DiLoreto*, 196 F.3d at 965.

1. Metro's Advertising Space is Likely a Limited Public Forum

When attempting to distinguish between a designated public forum and a limited public forum, courts look to "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U.S. at 802. That intention is consistent with a designated public forum, but government restrictions (via policy and practice) on access to a forum based on objective standards indicate a limited public forum. *See Hopper*, 241 F.3d at 1077-78. Both a policy and a consistent application thereof must be present in order to establish that a government intended to create a limited public forum. *Hopper*, 241 F.3d at 1076.

In *Lehman v. City of Shaker Heights*, the Supreme Court examined a city's policy of excluding political advertising from the space inside its transit vehicles. 418 U.S. 298 (1974). The Court found that a designated public forum had not been created:

> Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker Heights. The car card space, although incidental to the provision of public transportation, is a part of the commercial venture.

> In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles. . . .
>
> No First Amendment forum is here to be found. The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity.

*Lehman*, 418 U.S. at 303-04. Similarly, the Ninth Circuit has found exterior advertising space on buses to be a limited public forum where a city "consistently promulgates and enforces policies restricting advertising on its buses to commercial advertising." *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 978 (9th Cir. 1998). Based on that policy, the court held that "[t]he city has not designated the advertising space on the exterior of its buses as a place for general discourse." *Id.*

Here, the Policy expressly identifies defendant's intent to create a limited public forum:

> <u>Limited Public Forum Status</u>. The County's acceptance of transit advertising does not provide or create a general public forum for expressive activities. In keeping with its proprietary function as a provider of public transportation, and consistent with KCC 28.96.020 and .210, the County does not intend its acceptance of transit advertising to convert its Transit Vehicles or Transit Facilities into open public forums for public discourse and debate. Rather, as noted, the County's fundamental purpose and intent is to accept advertising as an additional means of generating revenue to support its transit operations. In furtherance of that discreet and limited objective, the County retains strict control over the nature of the ads accepted for posting on or in its Transit Vehicles and Transit Facilities and maintains its advertising space as a limited public forum.
>
> In the County's experience, certain types of advertisements interfere with the program's primary purpose of generating revenue to benefit the transit system. This policy advances the advertising program's revenue-generating objective by prohibiting advertisements that could detract from that goal by creating substantial controversy, interfering with and diverting resources from transit operations, and/or posing significant risks of harm,

> inconvenience, or annoyance to transit passengers, operators and vehicles. Such advertisements create an environment that is not conducive to achieving increased revenue for the benefit of the transit system or to preserving and enhancing the security, safety, comfort and convenience of its operations. The viewpoint neutral restrictions in this policy thus foster the maintenance of a professional advertising environment that maximizes advertising revenue.

Dkt. # 13 at 28 (Ex. C to Desmond Decl., Policy § 2.3). The "viewpoint neutral restrictions" in the Policy include a prohibition on political campaign speech, and advertising that is false or misleading, demeaning and disparaging, or harmful or disruptive to the transit system, among others. *Id.* at 30-32 (Policy §§ 6.21, 6.24, 6.28, 6.29). Additionally, defendant's advertising policies "are designed to strike an appropriate balance between the need for supplemental revenue, and Metro's primary mission of encouraging ridership through the provision of quality customer experience." Dkt. # 13 (Desmond Decl.) ¶ 12.

Defendant's practice in implementing the Policy also evinces its intent to create a limited public forum. Defendant's policy does not prohibit all forms of political speech. Rather, it prohibits political campaign speech, as well as advertising that is false or misleading, demeaning and disparaging, or harmful or disruptive to the transit system. In reviewing any advertisement, defendant follows the procedural process mandated by the Policy in order to ensure compliance with the policy directives. Dkt. # 13 (Desmond Decl.) ¶ 19. All ads are initially screened by Titan, and if compliance with the Policy cannot be determined, the ad is submitted to Ms. Shinbo. *Id.* If Ms. Shinbo has concerns about compliance, she elevates the advertisement to Mr. Desmond. *Id.* Mr. Desmond has implemented a process to ensure that his decisions are consistent with the Policy and fair to the proponent of the proposed advertising. *Id.* ¶ 20. All ads, regardless of whether they are political or public-issue in subject matter, must adhere to the Policy to ensure

ORDER - 7

that the advertisements are consistent with the primary purpose of operating a transit system.[1]  *See* Dkt. # 13 (Desmond Decl.) ¶¶ 11-13, 19-21; Dkt. # 14 (Shinbo Decl.) ¶ 6.

Thus, pursuant to the Policy, defendant has accepted and rejected ads on varying sides of the Israeli-Palestinian conflict, despite the politicized nature of the subject matter.  Dkt. # 14 (Shinbo Decl.) ¶¶ 9-11, Exs. A & B.  The fact that defendant has allowed prior advertising that is considered political or controversial does not change the fact that it has consistently subjected all potential advertisements to the civility provisions to ensure that the advertisements are not false or misleading, demeaning or disparaging, or harmful or disruptive to the transit system. *See DiLoreto*, 196 F.3d at 967 ("Although not dispositive, the fact that the District screened and rejected the ad is evidence that the District intended to create a limited public forum closed to certain subjects, such as religion.").  Additionally, a few instances of imperfect enforcement of a restriction or a mistake in accepting a prior ad do not preclude an agency from rejecting subsequent ads that violate its standard.  *See Cornelius*, 473 U.S. at 805 ("The Government did not create the [charity funding drive] for purposes of providing a forum for expressive activity.  That such activity occurs in the context of the forum created does not imply that the forum thereby becomes a public forum for First Amendment purposes."); *see also Ridley v. Mass. Bay Transp. Authority*, 390 F.3d 65, 78 (1st Cir. 2004) ("One or more instances

---

[1] The court is aware of potential constitutional problems when government officials are given unbridled discretion in regulating speech, including in limited public fora.  However, at this preliminary injunction stage, AFDI has not demonstrated a likelihood that government employees were given unbridled discretion where defendant has a set procedural process it consistently follows that imposes limitations on the exercise of discretion and where all ads are subject to the prohibitions in the Policy against content that is false, misleading, demeaning or disparaging, and that interfere with service.  The court notes that this case presents a close question and the court has grave concerns about defendant's Policy where application of the civility provisions appear to be somewhat of a moving target.  Nevertheless, at this stage of the proceeding, AFDI, as the moving party, has not met its burden to demonstrate that a mandatory injunction is warranted.

of erratic enforcement of a policy does not itself defeat the government's intent not to create a public forum.").

Accordingly, the court finds that defendant's policy and practice indicates an intention to create a limited public forum.

2. Defendant's Decision to Reject Plaintiffs' Advertisement Was Reasonable

Courts uphold speech restrictions in limited public forums as long as they are reasonable and viewpoint neutral. *DiLoreto*, 196 F.3d at 965. Reasonableness is evaluated "in light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. "The restriction need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992) (internal quotations and emphasis omitted).

The purpose of the Metro advertising program is to generate revenue to support the on-going delivery of transportation services to the public. Dkt. # 13 (Desmond Decl.) ¶ 8; *see* KCC 28.96.210 ("As part of its proprietary function as the provider of public transportation, the county seeks to generate revenue from the commercial use of transit vehicles, the tunnel and other passenger facilities to the extent such commercial activity is consistent with the security, safety, comfort and convenience of its passengers."). Transit advertising is subsidiary to Metro's primary mission of providing a quality transit service. *Id.* ¶ 11. The advertising copy that Metro allows on its properties significantly impacts the ridership experience, and the prohibition against advertising that is false or misleading, demeaning or disparaging, or harmful or disruptive to the transit system applies to all advertising to maintain a courteous and respectful level of discourse. *Id.*

The court finds that the civility and interference with service restrictions in the Policy are reasonable restrictions that promote the safety, reliability and quality of the public transit system.

3. <u>Defendant's Decision to Reject Plaintiffs' Advertisement Was Viewpoint Neutral</u>

The government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject. *Cornelius*, 473 U.S. at 806. Viewpoint discrimination is a form of content discrimination in which the government targets not subject matter, but particular views taken by speakers on a subject. *Children of the Rosary*, 154 F.3d at 980. If the speech at issue does not fall within an acceptable subject matter otherwise included in the forum, the government may legitimately exclude it from the forum it has created. *Cogswell v. Seattle*, 347 F.3d 809, 815 (9th Cir. 2003). However, if the speech does fall within an acceptable subject matter otherwise included in the forum, the government may not legitimately exclude it from the forum based on the viewpoint of the speaker. *Id.*

Defendant has accepted an advertisement on the subject of terrorism. Dkt. # 14 (Shinbo Decl.) ¶18, Ex. H. The advertisement provides an anti-terrorism, stop-a-terrorist viewpoint. *Id.* The advertisement submitted by AFDI provides a similar anti-terrorism, stop-a-terrorist viewpoint. *Id.* ¶ 20, Ex. J; Dkt. # 7-1 (Geller Decl.) ¶ 25. In addition to the similar viewpoint, however, the AFDI ad also contains false, misleading, demeaning and/or disparaging content, which is prohibited by the Policy for all advertisements regardless of viewpoint. The content of the AFDI advertisement provides: "The FBI Is Offering Up To A $25 Million Reward If You Help Capture One Of These Jihadis." *Id.* First, there is no evidence before the court that the FBI is offering a reward for any of the individuals pictured. Rather, the United States Department of State, through the Rewards for Justice Program, is offering the rewards. *See* Dkt. # 7-4 (Ex. C to Geller Decl.). The court notes that the FBI is offering a reward of up to $250,000 for information leading directly to the arrest of Daniel Andreas San Diego, and up to $1,000,000 for information directly leading to the apprehension of Joanne Chesimard. Dkt. # 7-4 at 5, 7 (Ex. C to Geller Decl.). However, neither of these individuals is pictured in the advertisement. Second, AFDI has presented evidence that the State Department provided rewards for

ORDER - 10

only six of the sixteen individuals pictured in the advertisement. *Cf.* Dkt. # 14 at 48 (Ex. J to Shinbo Decl.) *with* Dkt. # 7-4 at 1-42 (Ex. C to Geller Decl.).[2] Nevertheless, defendant has provided evidence that the State Department provided rewards for all of the individuals pictured. Dkt. # 14 at 52-54 (Ex. L to Shinbo Decl.). However, stating that a reward of up to $25 million is available if you help capture "one of these" individuals is false and misleading where none of the rewards for the individuals pictured offered a $25 million reward.[3]

Finally, the term "jihadis" has varying meanings. While many individuals have conflated the terms jihad and terrorism, the term "jihad" has several meanings, including: (1) "a holy war waged on behalf of Islam as a religious duty";[4] (2) "a personal struggle in devotion to Islam especially involving spiritual discipline"; (3) "a crusade for a principle or belief"; (4) "(among Muslims) a war or struggle against unbelievers"; (5) "(also greater jihad) Islam the spiritual struggle within oneself against sin." *See Merriam-Webster*, http://www.merriam-webster.com/dictionary/jihad (last visited Jan. 15, 2014); *Oxford English Dictionary*, http://english.oxforddictionaries.com/definition/jihad?region=us (last visited Jan. 15, 2014); *see also* Dkt. # 13 (Desmond Decl.) ¶ 26 ("By my understanding of the term, the concept of 'jihad' refers not only to physical struggles, but more importantly, to the inner struggle by a believer to fulfill his religious duties to Islam."). Additionally, there is no dispute that each of the individuals included in Exhibit C to Geller's declaration engaged

---

[2] AFDI has provided the court with evidence that the State Department provided rewards for the following individuals who also appeared in the advertisement: Adam Gadahn, Jehad Mostafa, Omar Hammami, Isnilon Hapilon, Zulkifli Abdhir (or Bin Hir), and Raddulan Sahiron. Dkt. # 7-4 at 8, 10, 16, 18, 40, 42 (Ex. C to Geller Decl.).

[3] The court notes that the State Department offered a reward "of up to $25 million for information leading directly to the apprehension or conviction of Ayman Al-Zawahiri." Dkt. # 7-4 at 27 (Ex. C to Geller Decl.).

[4] This appears to be the definition of the term that AFDI invokes in referring to terrorists as jihadis.

in terrorist activities. However, there is no evidence before the court that any of the individuals pictured in the ad referred to themselves as "jihadis" or performed the terrorist acts in the name of "jihad," as opposed to any other reason.[5] *See* Dkt. # 7-4 at 8, 10, 16, 18, 40, 42 (Ex. C to Geller Decl.). Accordingly, the court finds that the ad's use of the term "jihadis" to mean terrorist is likely misleading.[6]

Accordingly, the court finds that plaintiffs have not demonstrated that they are likely to prevail on the merits.

**B. Irreparable Harm, Balance of the Equities, and Public Interest**

Plaintiff's arguments regarding irreparable harm, balance of the equities, and public interest rely on a finding of the likelihood of a First Amendment violation. Dkt. # 7 at 18-19. Since AFDI has not demonstrated the existence of a colorable First Amendment claim, the court finds that AFDI has not met its burden on the remaining factors as well.

Plaintiff has not demonstrated that it is entitled to injunctive relief.

### IV. MOTION TO STAY

Defendant moves the court for a stay pending issuance of a final decision from the Ninth Circuit in *Seattle Mideast Awareness Campaign v. King County*, Case No. 11-35914. Dkt. # 10. AFDI indicates that if the court denied the preliminary injunction motion, it might appeal the court's ruling or not oppose defendant's motion to stay. Dkt. # 11 at 3. The court agrees with AFDI that defendant's motion was premature.

---

[5] Indeed, the only reference to the term "jihad" that appears in the evidence is with respect to Abd Al Aziz Awda, who does not appear in the ad and for whom there is no reward. Dkt. # 7-4 at 20 (Ex. C to Geller Decl.) ("wanted for conspiracy to conduct the affairs of the designated international terrorist organization known as the 'Palestinian Islamic Jihad[.]'").

[6] For the same reasons, the court also notes that it is likely that a reasonably prudent person would believe that the AFDI ad contains material that is abusive or hostile to, or debases the dignity of stature of practitioners of the Muslim faith who are not terrorists and take their sacred duty of "jihad" (the personal or spiritual struggle) seriously.

Accordingly, the court DENIES defendant's motion without prejudice. Dkt. # 10. The court ORDERS the parties to meet and confer regarding the possibility of a renewed motion to stay now that the parties have the court's analysis denying preliminary injunction within ten days of this order. Defendant may file a motion to stay thereafter if the parties do not reach an agreement on the course of conduct.

## V. CONCLUSION

For all the foregoing reasons, the court DENIES plaintiffs' motion for preliminary injunction (Dkt. # 7), and DENIES defendant's motion for a stay without prejudice (Dkt. # 10). Additionally, the court exercises its discretion to DENY American Civil Liberties Union of Washington's motion for leave to file an amicus brief. Dkt. # 15.

Dated this 30th day of January, 2014.

_Richard A. Jones_
The Honorable Richard A. Jones
United States District Judge